EJK:MPC

**M-11-236**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA | COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION |
| - against - | FOR ARREST WARRANTS |
| | (7, U.S.C., § 2024(b)(1)) |
| FAYIZ ZOKARI, | |
| FAWAZ ZOKARI, | |
|     also known as "Waddah" and | |
| KAID ZOKARI, | |
|     also known as "Romeo," | |
| Defendants. | |

- - - - - - - - - - - - - - - - -X
- - - - - - - - - - - - - - - - -X

| | |
|---|---|
| IN THE MATTER OF THE UNITED STATES OF AMERICA TO SEARCH THE PREMISES KNOWN AND DESCRIBED AS W. DELI AND GROCERY 111-40 SPRINGFIELD BOULEVARD, QUEENS VILLAGE, NEW YORK 11429 INCLUDING THE BASEMENT APARTMENT AND SAFE DEPOSIT BOX #431-2 LOCATED AT CITIBANK 217-10 JAMAICA AVENUE, QUEENS VILLAGE, NEW YORK 11429. | AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS |

- - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

LUIGI STOLFA, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Agriculture, Office of Inspector General ("OIG").

In or about and between June 2010 to the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FAYIZ ZOKARI,

-1-

FAWAZ ZOKARI, also known as "Waddah," and KAID ZOKARI, also known as "Romeo," together with others, willfully and intentionally conspired to use, transfer, acquire and possess food stamp benefits, in excess of $5,000, contrary to the Supplemental Nutrition Assistance Program, and regulations issued thereunder, in violation of Title 7, United States Code, Section 2024(b)(1).[1]

Upon information and belief, there is probable cause to believe that there is evidence located inside THE PREMISES KNOWN AND DESCRIBED AS W. DELI AND GROCERY, 111-40 SPRINGFIELD BOULEVARD, QUEENS VILLAGE, NEW YORK, 11429 INCLUDING THE BASEMENT APARTMENT (the "SUBJECT PREMISES"), and any closed containers and items contained therein, of violations of Title 7, United States Code, Section 2024 and Title 18, United States Code, Section 371 (unauthorized use, transfer, acquisition and possession of USDA food stamp benefits and conspiracy to commit same (collectively, "the Offenses")).

In addition, upon information and belief, there is probable cause to believe that there is evidence located inside the location known and described as SAFE DEPOSIT BOX #431-2 LOCATED AT CITIBANK 217-10 JAMAICA AVE, QUEENS VILLAGE, NEW YORK held in the names of FAYIZ ZOKARI and FAWAZ ALZOKARI (the "SUBJECT SAFE DEPOSIT BOX"), and any closed containers and items contained therein, of the Offenses.

---

[1] A copy of 7 U.S.C. § 2024 is attached.

The sources of my information and the grounds for my belief are as follows:

1. I am a Special Agent with the United States Department of Agriculture ("USDA") and have been so employed for one year and six months. Prior to working for the USDA, I spent 8 years in the US Navy as an intelligence specialist and one year as an investigative assistant with the Office of Personnel Management. During my time as a Special Agent with USDA, I have been involved in many investigations relating to violations of federal law. I have received training in various investigative techniques including the execution of search warrants.

2. The statements contained in this Affidavit are based upon my investigation, my experience, and my background as a special agent with USDA, information provided by other law enforcement agents and reports that I have reviewed. I have set forth in this affidavit only the facts necessary to establish probable cause to arrest.

3. The SUBJECT PREMISES is a two-story, mixed commercial/residential building, with the first floor acting as a retail grocery store known as "W. Deli & Grocery Inc." The building runs on the west side of Springfield Blvd. between 111th and 112th Streets. The SUBJECT PREMISES is accessed by entering the front of the store through a glass front door in the middle of the building. Over the exterior of the SUBJECT PREMISES is a

red awning with the words, "Stop 1 W. Deli Grocery, Inc." written in white lettering. North of the entrance of the SUBJECT PREMISES is a reddish brown door that leads to an attached basement apartment. Cooperating witnesses ("CW-1") and ("CW-2") have confirmed that the video recordings of the store security stapes are kept in the apartment on a computer hard drive. Moreover, CW-1 and CW-2 confirmed that FAYIZ ZOKARI and KAID ZOKARI, also known as "Romeo," reside in the downstairs apartment. Immediately south of SUBJECT PREMISES is a restaurant, "Crown Fried Chicken," which is covered by a red awning. Immediately north is a one-story business with an unknown name.

**Background**

4. The USDA administers a food stamp program in which pre-approved retail food retailers may sell food in exchange for coupons, commonly known as food stamps, presented by eligible members of certain low-income households. These USDA food stamps may only be used to purchase certain eligible food items, and, pursuant to 7 U.S.C. § 2016 and 7 C.F.R. § 278.2(a), an authorized retail food store may not exchange cash for USDA food stamps. Congress' enactment of the 2008 Farm Bill, Pub. L. No. 110-246, brought several changes to what used to be known as the Food Stamp Program. The following summary of the changes is for reference. The "Food Stamp Act of 1977" was renamed the "Food

-4-

and Nutrition Act of 2008." The food stamp program was renamed the Supplemental Nutrition Assistance Program ("the SNAP"). Section 15 of the Food and Nutrition Act of 2008 (7 U.S.C. § 2024) was amended so that all references to coupons, authorization cards, and/or access devices were replaced with the broader term "benefits."

5. Retailers who participate in the SNAP must apply for a license to redeem food stamps. A retailer's application must detail, among other things, the retailer's address, owners, hours of business, estimated gross annual food sales, and other pertinent information. Before the SNAP will authorize a retailer to participate in the program, an owner or designated representative of the retailer is required to be notified of rules and regulations and at times attend an orientation class at which pertinent rules and regulations pertaining to the food stamp program are taught.

6. SNAP benefits are distributed to recipients in the New York metropolitan area through the use of Electronic Benefit Transfer ("EBT") cards provided by the SNAP, which function in a manner similar to debit cards. On the back of each EBT card, there is a magnetic strip containing electronically coded information identifying the particular recipient and the dollar amount of the benefits to which that recipient is presently entitled. At the beginning of each month, the benefits are

-5-

encoded electronically on this magnetic strip. For instance, if a recipient is authorized to receive $300 per month in the SNAP benefits, the recipient's SNAP EBT card would reflect those benefits beginning on or about the first day of each month.

7. Retailers who have been approved by SNAP to participate in the program receive a computer terminal capable of reading the coded information on the SNAP EBT card and adjusting the available dollar amount when a user makes eligible purchases with the card. This electronic transfer of benefits is initiated at the retailer's terminal by deducting benefits from the recipient's account and crediting the amount to a bank account that the retailer earlier authorized for that purpose. Both the State of New York and the SNAP in Washington, D.C., maintain computerized records of each EBT card transaction, including the time and amount of each transaction. Portions of the transmission of data between retailers' SNAP EBT computer terminals in the New York City metropolitan area, computers maintained by the State of New York, and computers maintained by SNAP in Washington, D.C. occurs over interstate wires.

8. For each SNAP EBT card transaction, the retailer's computer terminal prints a receipt stating: "DO NOT DISPENSE CASH." In addition, the training literature provided by the SNAP and, in this particular store's instance, at the initial training session that the owner attended, the SNAP instructs the retailers

that no cash may be dispensed during a SNAP EBT transaction.

9. SNAP records show that the SUBJECT PREMISES was authorized to participate in the SNAP in about June 2006. A SNAP application dated May 29, 2006, listed FAYIZ ZOKARI of W. Deli and Grocery Inc., Queens Village, New York as the store president. The store's annual gross retail and wholesale sales were estimated to be $350,000. On the application, the store was categorized as a Convenience Store. In 2010, W. Deli and Grocery had redemptions of over $408,820 for SNAP EBT transactions over $50.

10. Pursuant to the SNAP rules, FAWAZ ZOKARI, also known as "Waddah," provided a bank account at Citibank in Queens, New York that would be dedicated for any redemption of SNAP benefits at the SUBJECT PREMISES. The bank account was subsequently changed to JP Morgan Chase Bank [Account #9072-0845-7165] (the "W Deli and Grocery account"). Thus from in or about May 29, 2006, up to and including the present, the SNAP has transmitted all funds owed to FAWAZ ZOKARI, also known as "Waddah," as credit for food stamp redemptions via direct deposit from bank accounts in Washington, D.C. to the W. Deli and Grocery account.

**Investigation of the Defendants**

11. Between June 2010 and the present, the defendants, FAYIZ ZOKARI, FAWAZ ZOKARI, also known as "Waddah," and KAID ZOKARI, also known as "Romeo," have been employed at W. Deli and Grocery, Inc. All three defendants operate the cash register and act as a cashier at the W. Deli and Grocery.

12. For approximately nine months, USDA OIG agents have been investigating the defendants for possible violations of the SNAP EBT benefits program. This investigation has revealed that the defendants, individually and collectively, debit customers' SNAP EBT cards for an amount that supposedly represents the price of a purchase of food. In these exchanges for SNAP EBT benefits, the defendants, FAYIZ ZOKARI, FAWAZ ZOKARI, also known as "Waddah," and KAID ZOKARI, also known as "Romeo," reduce the amount of cash given to the customer by approximately 33 percent of the total value of the SNAP EBT benefits charged against the customer's EBT account. In turn, the defendants would take the difference in value not given to the customer and improperly transfer these SNAP EBT funds to the W. Deli and Grocery account in violation of the law.

13. From about June 2010 through February 2011, a cooperating witness ("CW-1") working under the direction of USDA OIG agents, engaged in SNAP EBT "purchases" from the SUBJECT PREMISES in which W. Deli and Grocery Inc. redeemed SNAP EBT

benefits from CW-1 in exchange for cash at a discounted rate. CW-1 consensually and surreptitiously recorded the conversations during which these transactions occurred. CW-1 is an individual who has provided reliable information to the government in the past and the information CW-1 has provided in the past has been corroborated. With respect to the transactions listed in paragraphs 13 through 22, CW-1 recorded these transactions by either audio or video surveillance equipment.

14. During an undercover operation conducted on July 8, 2010, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with FAWAZ ZOKARI, also known as "Waddah." CW-1 gave ZOKARI the card and asked for $100 in cash. ZOKARI agreed to give the cash in exchange for $151.11 in SNAP EBT benefits. CW-1 agreed to the transaction and received $100 in cash in exchange for a $151.11 charge to the SNAP EBT account.

15. During an undercover operation conducted on July 14, 2010, CW-1 again used a SNAP EBT card at the SUBJECT PREMISES with the defendant FAWAZ ZOKARI, also known as "Waddah." CW-1 gave ZOKARI the card and asked for $100 in cash. ZOKARI agreed to give the cash in exchange for SNAP EBT benefits. CW-1 agreed to the transaction and received $103 in cash in exchange for a $154.38 charge to the SNAP EBT account.

16. During an undercover operation conducted on August 6, 2010, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with the

defendant KAID ZOKARI, also known as "Romeo." CW-1 gave ZOKARI the card and asked for cash. ZOKARI agreed to give the cash in exchange for SNAP EBT benefits. CW-1 agreed to the transaction and received $120 in cash in exchange for a $182.96 charge to the SNAP EBT account.

17. During an undercover operation conducted on August 18, 2010, CW-1 again used a SNAP EBT card at the SUBJECT PREMISES with KAID ZOKARI, also known as "Romeo." CW-1 gave ZOKARI the card and asked for cash. ZOKARI agreed to give the cash in exchange for SNAP EBT benefits. CW-1 agreed to the transaction and received $101 in cash in exchange for a $151.77 charge to the SNAP EBT account.

18. During an undercover operation conducted on September 2, 2010, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with FAWAZ ZOKARI, also known as "Waddah." CW-1 gave ZOKARI the card and asked for $150 in cash. ZOKARI agreed to give the cash in exchange for SNAP EBT benefits. CW-1 agreed to the transaction and received $150 in cash in exchange for a $215.21 charge to the SNAP EBT account.

19. During an undercover operation conducted on September 9, 2010, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with FAWAZ ZOKARI, also known as "Waddah." CW-1 gave ZOKARI the card and asked for $100 in cash. ZOKARI agreed to give the cash in exchange for SNAP EBT benefits. CW-1 agreed to the transaction and received $110 in cash in exchange for a $166.42 charge to the SNAP EBT

account.

20. During an undercover operation conducted on October 6, 2010, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with FAWAZ ZOKARI, also known as "Waddah." CW-1 gave ZOKARI the card and asked for $150 in cash. ZOKARI agreed to give the cash in exchange for SNAP EBT benefits. CW-1 agreed to the transaction and received $150 in cash in exchange for a $224.86 charge to the SNAP EBT account.

21. During an undercover operation conducted on November 5, 2010, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with FAWAZ ZOKARI, also known as "Waddah." CW-1 gave ZOKARI the card and asked for $100 in cash. ZOKARI agreed to give the cash in exchange for SNAP EBT benefits. CW-1 agreed to the transaction and received $100 in cash in exchange for a $165.44 charge to the SNAP EBT account.

22. During an undercover operation conducted on December 10, 2010, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with FAWAZ ZOKARI, also known as "Waddah." CW-1 gave ZOKARI the card and asked for $100 in cash. ZOKARI agreed to give the cash in exchange for SNAP EBT benefits. CW-1 agreed to the transaction and received $100 in cash in exchange for a $151.22 charge to the SNAP EBT account.

23. During an undercover operation conducted on February 2, 2011, CW-1 used a SNAP EBT card at the SUBJECT PREMISES with KAID

ZOKARI, also known as "Romeo." CW-1 gave ZOKARI the card and asked for cash. ZOKARI agreed to give the cash in exchange for SNAP EBT benefits. CW-1 agreed to the transaction and received $150 in cash in exchange for a $221.36 charge to the SNAP EBT account.

24. In or about 2005, a cooperating witness ("CW-2"), witnessed the defendants FAYIZ ZOKARI, FAWAZ ZOKARI, also known as "Waddah," and KAID ZOKARI, also known as "Romeo," commit SNAP EBT fraud. On multiple occasions CW-2 observed all three defendants charge SNAP EBT cards in exchange for cash. Furthermore, FAWAZ ZOKARI, also known as "Waddah," instructed CW-2 on how to properly commit the Offenses. Both FAYIZ ZOKARI and FAWAZ ZOKARI, also known as "Waddah," told CW-2 in sum and substance that the best way to avoid detection and seizure of the money stolen during the SNAP EBT fraud was to move the money out of the bank account and into a safe deposit box. Moreover, CW-2 personally witnessed both FAYIZ ZOKARI and FAWAZ ZOKARI, also known as "Waddah," transfer cash from a bank account to the SUBJECT SAFE DEPOSIT BOX.

25. In or about and between 2008 and October 2010, both dates being approximate and inclusive, a cooperating witness (CW-3) witnessed the defendants FAYIZ ZOKARI, FAWAZ ZOKARI, also known as "Waddah," and KAID ZOKARI, also known as "Romeo," commit SNAP EBT fraud on multiple occasions. Specifically CW-3 related to Your Deponent that the defendants would keep a box filled with

cash above the register to facilitate the SNAP EBT fraud. CW-3 observed the defendants take cash out of the box to pay SNAP customers when they commit the fraud. This activity described to me has been independently corroborated by the video surveillance conducted with the assistance of CW-1. Moreover, CW-3 personally witnessed both FAYIZ ZOKARI and FAWAZ ZOKARI, also known as "Waddah," transfer cash from a bank account to the SUBJECT SAFE DEPOSIT BOX.

26. A review of the bank account associated with the SUBJECT PREMISES SNAP EBT account shows large withdrawals of cash consistent with the information provided by both CW-2 and CW-3. For example, between September 20, 2010 and November 16, 2010, there were sixteen cash withdrawals from the account associated with the SUBJECT PREMISES in amounts varying from $4000 to $10,000. On three separate dates, $10,000 was withdrawn from the account.

27. Both CW-2 and CW-3 have made direct observations of the basement apartment of the SUBJECT PREMISES and observed the computer equipment that supports the security video cameras in the convenience store. Both CW-2 and CW-3 have a working knowledge of the equipment and state that the computer equipment holds video for up to six months. Both CW-2 and CW-3 state that there is a security camera capturing video of the area around the

cash register. This is the area where the SNAP EBT fraud is being conducted.

28. CW-2 and CW-3 have also observed log books, invoices, receipts from vendors and other business related documents in the area behind the counter at the SUBJECT PREMISES. These documents were also observed by CW-1 as recently as February 3, 2011.

**Comparison to Similar Markets**

29. The SUBJECT PREMISES is classified by USDA as a convenience store. USDA classifies stores according to size based upon a store's estimated or actual sales figures. Your Affiant's visual observations of the SUBJECT PREMISES during the relevant period revealed that it had limited eligible food stock displayed along the aisles, and the store operated only one cash register.

30. USDA redemption data was used to compare the amount of SNAP benefits redeemed at the SUBJECT PREMISES during the time period January 2010 through January 2011 with other similar-sized grocery stores in the same geographical area. This comparison showed that during the period in question, the other similar-sized grocery stores redeemed between $200 and $6000 in SNAP benefits each month for transactions over $50, while the SUBJECT PREMISES redeemed an average of $34,000 in SNAP benefits each month for transactions over $50.

**Surveillance**

31. Surveillance conducted at the SUBJECT PREMISES during undercover operations revealed that the dollar amount of SNAP EBT purchases associated with the bank account for the SUBJECT PREMISES could not be substantiated by the customer base observed. Many customers left the store empty-handed or with only a beverage or a small bag. No shopping baskets or shopping carts were offered to customers.

**Review of Daily EBT Redemptions**

32. A review of the SNAP EBT transactions at the SUBJECT PREMISES show that there are multiple high dollar amount transactions happening in a short period of time usually in the beginning of the month. This is a indicator of SNAP EBT fraud due to the fact that SNAP EBT accounts are replenished at the beginning of each month.

32. The SUBJECT PREMISES had redemptions of transactions of $26,000 in January 2010. By December of 2010 the SUBJECT PREMISES had monthly redemptions over $42,000 for transactions over $50. This excessive increase in SNAP EBT redemptions is also indicative of SNAP EBT fraud. Based on Your Affiant's review of documents and observations, the store made no significant changes in stock, structural changes, or changes in location that might explain such an increase.

33. Based on the foregoing — as well as my

conversations with other law enforcement officers, training, and experience regarding the practices and methods of supplemental nutrition assistance program fraud — I respectfully submit that there is probable cause to believe that both the SUBJECT PREMISES and the SAFE DEPOSIT BOX contain instrumentalities, evidence, and fruits of criminal activity. These instrumentalities, evidence, and fruits include:

    a.    Electronic benefit transaction ("EBT") cards;

    b.    Equipment used in connection with EBT card transactions, including but not limited to EBT terminals, pin pads, card swipe devices, and recipient printers;

    c.    Any and all materials/equipment relating to the USDA's supplemental nutrition assistance program, including but not limited to licenses, application materials, notices, training materials, records of redemptions, service records;

    d.    Any and all licenses (and related application materials) permitting the sale of items at the SUBJECT PREMISES, including but not limited to cigarettes, alcohol, New York Lotto, and other items.

    e.    Financial/business records, including but not limited to checks, wires, journals, ledgers, faxes and/or fax machines, stored records inside cash registers, diaries, account applications, service agreements, contracts, loans, credit cards, bills, receipts, deposit and withdrawal slips, bank statements,

correspondence relating thereto (including electronic mail);

   f. Invoices, payroll records, and tax records/returns;

   g. Address books, contact lists, phone directories, calendars, and/or any personal data assistants or other electronic devices (including computers) containing such information;

   h. United States currency; and

   i. Any audio and/or video recordings of activities at or near the SUBJECT PREMISES.

  34. In addition, I respectfully request permission to, if necessary, remove any closed containers (including computer equipment or data storage devices) from the SUBJECT PREMISES and SAFE DEPOSIT BOX, if such containers cannot be opened or accessed by law enforcement personnel conducting the initial search. Law enforcement officers will determine during the search whether the removal of some or all container/equipment is necessary to retrieve relevant materials. If it appears necessary to remove the container/equipment to permit the search for relevant materials, the container/equipment will be removed from the SUBJECT PREMISES and SAFE DEPOSIT BOX until its contents can be accessed by other law enforcement officials. If the container/equipment itself is not relevant evidence or subject to forfeiture, relevant materials will be retrieved and the

-17-

container/equipment will be returned to the SUBJECT PREMISES and SAFE DEPOSIT BOX as quickly as possible.

WHEREFORE, your deponent respectfully requests that a warrant be issued under seal authorizing a search of SUBJECT PREMISES and the SUBJECT SAFE DEPOSIT BOX, including any locked rooms, containers or safes located therein, and authorizing seizure of the items described in Schedule A hereto, all of which constitute evidence, fruits, and instrumentalities of violations of Title 7, United States Code, Section 2024(b)(1) and Title 18, United States Code Section 371.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants FAYIZ ZOKARI, FAWAZ ZOKARI, also known as "Waddah," and KAID ZOKARI, also known as "Romeo," and that the defendants be dealt with according to law.

Luigi Stolfa
Special Agent
U. S. Department of Agriculture
Office of Inspector General

Sworn to before me this
____ day of March, 2011

## ATTACHMENT A

      a.   Electronic benefit transaction ("EBT") cards;
      b.   Equipment used in connection with EBT card transactions, including but not limited to EBT terminals, pin pads, card swipe devices, and recipient printers;
      c.   Any and all materials/equipment relating to the USDA's supplemental nutrition assistance program, including but not limited to licenses, application materials, notices, training materials, records of redemptions, service records;
      d.   Any and all licenses (and related application materials) permitting the sale of items at the SUBJECT PREMISES, including but not limited to cigarettes, alcohol, New York Lotto, and other items.
      e.   Financial/business records, including but not limited to checks, wires, journals, ledgers, faxes and/or fax machines, stored records inside cash registers, diaries, account applications, service agreements, contracts, loans, credit cards, bills, receipts, deposit and withdrawal slips, bank statements, correspondence relating thereto (including electronic mail);
      f.   Invoices, payroll records, and tax records/returns;
      g.   Address books, contact lists, phone directories, calendars, and/or any personal data assistants or other electronic devices (including computers) containing such information;
      h.   United States currency; and
      i.   Any audio and/or video recordings of activities at or near the SUBJECT PREMISES.

*All of which are fruits, instrumentalities and evidence of violations of Title 7, United States Code, Section 2024.*